CONSTANCE HOCKERT, Appellee, v. NEW YORK LIFE INSURANCE COMPANY, Appellant.

No. 44054.

DECEMBER 14, 1937.

H. E. Narey and Wilson Cornwall, for appellee.

Milchrist, Schmidt & Marshall, for appellant.

MITCHELL, J.—On August 24, 1927, the New York Life Insurance Company issued its policy to George B. Hockert in the original amount of $5,000, at which time he was 28 years of age. The semiannual premiums were in the amount of $71.60 and were due on August 18th and February 18th. The original beneficiary was Olive Hockert, the mother of insured, but on January 20, 1928, the beneficiary was changed to Constance Hockert, his wife. On February 18, 1928, the face amount of the policy was reduced to $3,000 and the semiannual premium to $42.96. The policy provided for double indemnity in the event of death from accidental causes.

On August 13, 1934, the insured borrowed on said policy the sum of $212, which indebtedness drew interest at the rate of 6%, payable semiannually, and the total amount of the indebtedness against the policy on February 18, 1935, including the interest, was $218.36. On the date of default, February 18, 1935, the policy had been in force seven and a half years, and its cash surrender value was $220.50. Deducting the indebtedness due on that date of $218.36, there was left a cash surrender value of $2.14.

On May 15, 1935, the insured, in compliance with instructions from the company, made an application for reinstatement, which was accompanied by what is known as a blue note, dated February 18, 1935, due May 18, 1935, in the sum of $32.46. Insured also sent his check in the amount of $10.50. On the 16th day of May, 1935, the company's manager at Sioux City acknowledged receipt of the application, the note and the check for $10.50, and then, by letter, advised the insured that the policy would again lapse on the 18th day of May, 1935, and in order to prevent that they were enclosing in the same letter what is known in the record as the second blue note. We quote in full the letter:

"NEW YORK LIFE INSURANCE COMPANY
"Sioux City Branch Office
"Frances Bldg., 5th and Pierce Sts.,
"Sioux City, Iowa
"Telephone, 55048
"J. Y. Hamilton,
"Agency Director

"Jos. Ness,            In Reply Refer To
"Cashier             File————————

"May 16, 1935.
"Mr. George B. Hockert,
"Arnolds Park, Iowa.
"Dear Mr. Hockert:             Re Pol. 9 966 634

"We are in receipt of your application for reinstatement together with your blue note properly signed by you and your check for $10.50. Under this arrangement, your premiums would only be extended to May 18, and if this blue note were not paid on or before that date then your policy would lapse again and it would be necessary that you apply for reinstatement and make arrangements to take care of balance premium or a further extension.

"We are enclosing another blue note which with the deposit of $4.56 will extend the balance of your premium payment to June 18, 1935, provided that this blue note and your remittance is mailed on or before. Saturday, May 18.

"Therefore, kindly give this your immediate attention and let us have the enclosed requirements by return mail.

           "Yours very truly,
               "Jos. Ness,
"JN/M                  Cashier."

On the 17th day of May, 1935, the insured, in compliance with the written instructions from the insurance company, signed the second blue note, executed his check in the amount of $4.56, payable to the company, then enclosed and mailed these instruments to Sioux City. This note and the check were received at Sioux City on the morning of May 20, 1935, and on that date the company returned to insured, by mail, the first note, informing him that the policy had been extended, and enclosed a receipt, which acknowledged receiving the $4.50 in cash, and the second blue note. The reason the receipt did not show $4.56 was that the six cents was interest. The check was deposited by the insurance company in its account at a Sioux City bank and cleared thru the Federal Reserve Bank at Chicago. On the day it was received at the Spirit Lake bank, the insured did not have sufficient in his account to cover this check and it was returned, marked "insufficient funds." The agent of the New York Life Insurance Company at Milford testified that on the morning of the 25th of May he received notice from the company that the check had not cleared thru the bank on which

it was drawn. He immediately notified the company that Hockert had been killed in an accident. At exactly what time this information reached the company does not appear in the record. However, it is interesting to note that on the 27th of May, which was the day the letter from the agent at Milford reached the office at Sioux City, informing them that Hockert had been killed, the New York Life Insurance Company notified Hockert (altho he was at that time dead) that his policy had lapsed. The local agent then asked for proofs of loss and was informed by the Sioux City office of the company that they would have to take the matter up with the New York office. A month or six weeks later they informed the beneficiary that the company was not liable on the policy. Constance Hockert brought this action to collect the amount due her. The jury having been waived, the case was tried to the court, which rendered a verdict against the insurance company for the full amount. The company being dissatisfied, has appealed.

■■■ There is no dispute between the parties as to the law of this case. It is conceded, both by appellant and appellee, that the general rule regarding checks is that the acceptance of a check by a creditor is not payment of a debt in the absence of some agreement to accept the check as payment. The question in this case is the application of the law to the facts. Appellee contends that the check in the amount of $4.56 was accepted as payment by the New York Life Insurance Company and that there was an agreement as shown by the facts in the case.

In the case of Dille v. White, 132 Iowa 327, at page 335, 109 N. W. 909, 912, 10 L. R. A. (N. S.) 510, this court said:

"That the intention of the parties shall prevail in determining whether the delivery and acceptance of a note, check, or draft, drawn by the debtor or by a third person are to be treated as payment in themselves, or as payment conditional upon the honoring of the paper by the drawee, is held with substantial unanimity by all the courts."

On page 342 of 132 Iowa, 109 N. W. 909, 915, 10 L. R. A. (N. S.) 510, we read:

"It is the settled rule of this court that the intent with which the note or check is received is a fact to which the parties may testify."

At page 341 of 132 Iowa, 109 N. W. 909, 914, 10 L. R. A. (N. S.) 510, we find the following:

"Whether the delivery of cashier's checks like those involved in this suit was intended and accepted as absolute payment has been held to be a question of fact for the jury."

At pages 64, 65 of 21 R. C. L. the rule is stated:

"The fact that a check or draft was received in absolute payment may be established by showing an express agreement to that effect, or by showing such circumstances as will satisfy the mind that such was the understanding of the parties at the time the check was taken. * * * Whether a check is given and accepted as absolute payment is a question of fact to be determined by the jury on the evidence presented."

In Cook & Bernheimer Co. v. Hagedorn, 82 Ind. App. 444, 131 N. E. 788, at page 792, the court said:

"While it is the general rule that a check delivered by a debtor to his creditor does not extinguish the debt for which it is given, still a check may be given and received by agreement of the parties as payment of a debt, and when this is done the debt for which it is given is thereby extinguished. If a check so given and accepted is not paid for any reason, the right of action is on the check and not on the indebtedness for which it is given."

In Rohrbach v. Hammill, 162 Iowa 131, at page 141, 143 N. W. 872, 875, we find this court said:

" 'We do not, however, understand the rule to require that there should be express words or writing of the parties agreeing that the check should be absolute payment. The circumstances and the conduct of the parties taken together may show an express understanding that the check is taken in satisfaction of the debt, or estop the creditor from claiming the contrary. As here, for example, the check was sent for the express purpose of payment, and was retained under circumstances implying that it was so accepted. * * * '

"We do not hold that the delivery and acceptance of the check in all cases discharges the original debt *pro tanto*, but we do hold that a check may be delivered and received under such

circumstances, and that the jury might well be justified in finding that, in the particular case, it was received as a partial payment of the consideration involved in the transaction, and here the relationship of the parties, the purpose for which the check was given and received, what was said and done at the time of the transaction, the words indorsed upon the check at the time of its delivery, the letter written by the defendant subsequently were sufficient to sustain a finding on the part of the jury that the check was given and received in part payment of the purchase price of the land in question. The fact that the check was subsequently returned does not tend to negative this fact. * * * We do not think the court erred in submitting this question to the jury, and we think the verdict of the jury has support in the evidence."

Appellant agrees with the rules of law set out in the quoted cases and concedes that the company is liable if the check was accepted as payment. We quote from appellant's brief and argument:

"If the check was accepted *as payment*, then it may be conceded that the policy was reinstated and the time to pay premiums extended."

■■■ This was a law action, tried to the court, without a jury. The question of whether this check was accepted for collection or payment was one of fact. The finding of the trial court has the same effect as the verdict of a jury. It found that the check was accepted in payment. Its finding cannot be disturbed on appeal unless there is absolute lack of evidence to support it.

■■■ With these rules of law in mind we turn to the record to ascertain the facts.

The policy had lapsed on the 18th day of February, 1935. Pursuant to instructions from the company some time early in May of 1935 Hockert signed an application for reinstatement, executed the first blue note and sent his check for $10.50, the amount required by the company. This reached the office of the company at Sioux City on the 16th day of May, 1935. The check for $10.50 was immediately cashed and payment received on it. This cash payment and the first blue note would have extended the policy only until the 18th of May and the agent

of the company thereupon wrote Hockert (who lived at Spirit Lake) a letter, known as Exhibit D in the record (which letter is set out in full in the first part of this opinion), which informed Hockert of the receipt of the application for reinstatement together with the first blue note and his check for $10.50, advising Hockert that under this arrangement his premium would only be extended to May 18th, and if the first blue note was not paid on that date the policy would lapse again and it would be necessary to apply for reinstatement. It then gave him explicit instructions as to what to do. We quote from the company's letter:

"We are enclosing another blue note which with the deposit of $4.56 will extend the balance of your premium payment to June 18, 1935, provided that this blue note and your remittance is mailed on or before Saturday, May 18th."

Hockert complied with this demand. He signed the second blue note and forwarded this with his check for the amount required. Now, when the insurance company sent this letter to Hockert it knew that the policy would lapse before the second blue note and remittance for $4.56 could reach its office at Sioux City because the 18th of May was on Saturday, the 19th Sunday (on which day the office was not open), and the 20th was the earliest possible time the company could receive the remittance. And yet the company said:

"You sign the second blue note and send it with your remittance for $4.56 on the 18th day of May, the day on which the policy will lapse, and the policy will not lapse."

Clearly, this shows that the company was willing to accept the check which Hockert placed in the mail on the 17th of May, the day before the policy would lapse, and which the company knew could not reach its office until after the policy had lapsed, as payment of the amount due on that premium. In addition to that we have this outstanding fact that when the check reached the office at Sioux City the New York Life Insurance Company accepted it, treated it as cash, and sent to Hockert its receipt. We quote from the receipt:

"This note is accepted by said Company at the request of the maker, together with Fifteen & no/100————————Dollars, in cash. * * *"

And further in the receipt we find the following:

"Received from——————————————$4.50 in cash, and a note, as per above copy. * * * "

The $15 referred to in the receipt is arrived at by adding the $4.50 to the $10.50, which was the first check Hockert had sent and which had been cashed by the company and the money received, making a total of $15. The six cents in the $4.56 check was for interest. In addition to issuing receipt showing the check was received as cash, the company extended the insurance policy immediately upon receipt of the check. It did not wait to see whether the check would clear, but at the moment it received the check the policy was extended. In fact, in the letter the company had written Hockert it had agreed to extend the policy if check was mailed on the 18th, which was the day the policy would have lapsed. Under that agreement it did, upon receiving the check, extend the insurance policy and returned to Hockert the first blue note marked "paid by renewal." Not only did the company thus show that it treated the check as payment, but, after it had been returned marked "insufficient funds," the insurance company did not first write to Hockert but instead it wrote to its agent at Milford, informing him that the check had been returned because of insufficient funds, and it was some two days later, after Hockert had been killed and there was apparent liability upon the part of the company upon the policy, that it notified Hockert, who was then dead, that the policy had lapsed. Why, even when the proofs of loss were asked for the general manager at Sioux City was doubtful in his mind as to whether the company was liable, and informed the agent at Milford by letter that they would not issue proofs of loss until the matter had been submitted to the home office, as to whether or not the company was liable. Insurance companies will not be permitted to play fast and loose with their policyholders and take one position when an insured is alive and there is no liability, and another when he is dead and there is a loss payable, which will enable the company to avoid payment to a beneficiary. Insurance policies are uniformly, and rightly, construed against the insurer. They should not be interpreted thru the magnifying eye of a technical lawyer. Clearly, in this case the facts show that the New York Life

Insurance Company accepted this $4.56 check in payment of the premium due.

Certainly there were sufficient facts upon which to base the verdict of the lower court, which sat as a jury in this case. The court could have arrived at no other conclusion.

Necessarily it follows that this case must be, and it is hereby, affirmed.—Affirmed.

The Chief Justice and ANDERSON, KINTZINGER, DONEGAN, RICHARDS, STIGER, and SAGER, JJ., concur.